Harold and Hazel **HESTER**, Appellants,

v.

Donald R. **BARNETT**, Respondent.

No. WD 36517.

Missouri Court of Appeals,
Western District.

Jan. 20, 1987.

David T. Greis, Kansas City, for appellants.

Larry Zahnd, Zahnd, Dietrich & Ross, Maryville, for respondent.

Before PRITCHARD, P.J., SHANGLER, J., and MARTIN, Special Judge.

SHANGLER, Judge.

The action for damages by the plaintiffs Hester, husband and wife, against defendant Barnett, a Baptist clergyman, commenced as a petition in defamation. The motion of the defendant to dismiss that petition was sustained, and the plaintiffs were granted leave to present a more definite and certain statement of the defamation. The petition as amended pleads not only defamation, but also five other separate causes of action denominated: [Count I] Ministerial Malpractice, [Count II] Alienation of Affections, [Count III] Defamation of Character, [Count IV] Intentional Infliction of Emotional Distress, [Count V] Invasion of Privacy, and [Count VI] Interference with Contract. The defendant Barnett moved to dismiss the petition as amended, and the court sustained the motion as to each of the several counts "for failure to state causes of action upon which relief may be granted." The plaintiffs appeal the judgment of dismissal.

A motion to dismiss concedes the truth of all facts well pleaded. In the assessment of the sufficiency of a petition under such a motion, therefore, all facts properly pleaded are assumed as true, the averments are given a liberal construction, and the petition is given the favor of those inferences fairly deducible from the facts alleged. *Commercial Bank of St. Louis Co. v. James*, 658 S.W.2d 17, 23[3–10] (Mo. banc 1983). A petition suffices against a motion to dismiss, accordingly, if the averments, given every reasonable intendment, invoke a substantive remedy. *Hyde v. City of Columbia*, 637 S.W.2d 251, 254[1–3] (Mo.App.1982); Rule 55.05. It is within the perspective of these maxims that we review the judgment of dismissal.

The first amended petition alleges these operative facts:

The plaintiffs Hester, husband and wife, reside in Nodaway County. The wife is the mother of Connie Wymer, Lee Wymer and Don Wymer, and the husband is their stepfather. The defendant Barnett is an ordained minister of the Baptist Church. The principals met when the minister visited the Hester home and presented himself to the family as an ordained Baptist clergyman. He invited them to trust and confide in him and assured them that any communication with him as minister would be kept in strictest confidence and not be divulged to anyone outside the Hester family. The husband and wife then confided in the minister that the three children, Connie, Lee and Don were beset with disciplinary and behavioral problems. The minister offered his family counseling services as the solution. Notwithstanding the prior assurances, the minister divulged to deacons of the church and members of the community the confidential communications from the family, and without their authority. The minister lied to these others about the communications and, in particular, that the Hesters abused the children and used them cruelly. The minister advised and instructed the children to lie to others as to the mode of the discipline so that they would eventually be removed from the home of the mother and stepfather. The minister undertook a course of action, which continues, designed to defame the Hesters in their community by denunciations that they are both irreligious and abusive parents. The minister thereafter apologized to the Hesters for this conduct and prayed for forgiveness in their presence, but nevertheless continues that course of conduct and refuses to retract the statements made to members of the public.

The petition alleges also that the minister intentionally and maliciously "set out to alienate the affections of one from the others," did alienate the children, Connie, Lee and Don, from the mother and stepfather, and attempted to induce the alienation of the wife from the husband.

The petition alleges also, by a catalogue of particulars, that the minister has, since January of 1984, used every opportunity to defame them, and from the pulpit as well as in letters and memoranda, church bulletins and publications, accused them of crimes, of physical and emotional abuse of the children and other relations, has falsely accused them of such conduct over the Hot Line for Child Abuse, and has organized and directed meeting of neighbors to publish the libels and slanders against the Hesters. The petition alleges also that the minister has harrassed, intimidated, threatened and caused the Hester employees to leave employment and so interfered with the Hester farming business.

The petition pleads these allegations as a continuous narrative, punctuated into the six designations of causes of action already described: Ministerial Malpractice, Alienation of Affections, Defamation of Character, Intentional Infliction of Emotional Distress, Invasion of Privacy, and Interference with Contract. The judgment dismisses them all. Our review determines whether as to any count the facts pleaded invoke a substantive remedy, and hence entitle the pleaders to a trial.

## COUNT I MINISTERIAL MALPRACTICE

The plaintiffs acknowledge that ministerial malpractice is a tort not known in Missouri law. They argue that the allegations of the petition, that the minister disclosed confidential communications from the Hesters, alienated the affections of the Hester family members, interfered with the business relationship between the Hesters and their farm employees, defamed the Hesters from the pulpit and otherwise in public, invaded their privacy and inflicted intentional emotional distress upon them, all bespeak breaches of a professional standard of care, and hence are suitable for redress by the malpractice remedy.

■ The term *malpractice* means *professional misconduct*. Black's Law Dictionary, p. 864 [5th ed. 1979]. It means "the failure to use that degree of skill and learn-

ing ordinarily used under the same or similar circumstances by members of [that] profession." MAI 11.06 [3d ed. 1981]; *see also* Restatement (Second) of Torts § 299A (1965). It means, by very definition, the breach of a professional duty unique to that profession. I Mo. Tort Law [Mo.Bar 1985], § 1.6 [Medical Malpractice]; § 2.1 [Attorneys Malpractice]; § 2.14 [Accountants Malpractice]; § 2.30 [Insurance Agents and Brokers Malpractice]. Malpractice, therefore, is not a theory of ordinary negligence or of intentional tort. The ordinary negligence or intentional tort of any person is already actionable, regardless of its "professional" color. Thus, also, a cleric is amenable to suit for alienation of affections albeit guised as a religious practice,[1] for assault and battery committed during a religious service, for a malicious prosecution of parents informed against by the cleric for child abuse, for the obtention of donations of money by fraud,[2] and for other incidences of intentional tort in the exercise of the religious duty.[3]

To avoid a redundant remedy, therefore, any functional theory of clergy malpractice needs address incidents of the clergy-communicant relationship not already actionable.[4] The duties of a clergyman most nearly approximate to an existent professional practice, and hence most accountable to minimum professional standards [preeminent commentators agree], include that of spiritual counseling: the advice a member of the clergy renders to meet the spiritual,

emotional, and religious needs of the communicant.[5] These authorities agree also—and that, whether they favor or disfavor the clergy malpractice remedy—that the validity of such a tort cause of action is most typically articulated in terms of the pastoral counseling function. The only reported case in which the petition presented the theory of clergy malpractice in terms of negligent counsel and spiritual advice leaves unresolved the question whether such a petition is justiciable.

That case, *Nally v. Grace Community Church of the Valley*, 157 Cal.App.3d 912, 204 Cal.Rptr. 303 (1984), was a claim by parents against a church and its pastors for the wrongful death of a son who committed suicide after counseling by the pastors. The young man, Kenneth Nally, had become depressed after a rift with his girlfriend. Shortly afterward, to the chagrin of his parents, the son converted from Catholicism to Protestantism and became a communicant of the Grace Community Church, a fundamentalist sect. He attended a Bible institute at the church and counseled with the pastor frequently to discuss his problems with the girlfriend and family. His depression deepened, and at the request of his mother, Nally consulted a physician, who placed him on antidepressent medication. Nally attempted suicide, and was hospitalized. Nally stayed at the home of the pastor after release, to avoid the tensions at home. He refused to keep psychiatric appointments since, as he be-

---

1. *Carrieri v. Bush,* 69 Wash.2d 536, 419 P.2d 132, 137[15, 16] (1966).

2. The range of decisions on the civil liability of clerics and religious leaders for their intentional torts, as well as the sources for such commentary, are reported in Klee, *Clergy Malpractice: Bad News for the Good Samaritan or a Blessing in Disguise?* 17 Toledo L.Rev. 209, 212, n. 23 (1985); Comment, *Made Out of Whole Cloth? A Constitutional Analysis of the Clergy Malpractice Concept,* 19 Cal.W.L.Rev. 507, 512, n. 31 (1983).

3. *Christofferson v. Church of Scientology,* 57 Or. App. 203, 644 P.2d 577 (1982) (intentional infliction of emotional distress); *Bear v. Reformed Mennonite Church,* 462 Pa. 330, 341 A.2d 105 (1975) (tortious interference with business relationships).

4. The petition of the Hester husband and wife pleads not only clergy malpractice, but separate counts for alienation of affections, defamation, intentional infliction of emotional distress, invasion of privacy and intentional interference with contract—all intentional torts, and so acknowledges a subsistent remedy for each of these grievances without need for resort to a malpractice theory, even though each of the torts as pleaded was an incident of the minister-communicant relationship.

5. B. Bergman, *Is the Cloth Unraveling? A First Look at Clergy Malpractice,* 9 U. San Fern.V.L. Rev. 47, 57–59 (1981); Ericsson, *Clergyman Malpractice: Ramifications of a New Theory,* 16 Val.L.Rev. 163, 166 (1981).

lieved, psychiatrists were not Christians and would not be able to help him. A few days later, Nally committed suicide.

The petition of the parents pleaded three counts. Count I, designated "CLERGY-MAN MALPRACTICE," alleged that the pastor in his role as spiritual counselor actively discouraged the disturbed parishioner from resort to professional psychiatric or psychological care outside the church. Instead, the pastor advised Nally to consult with church counselors, pray, read the Bible, and listen to taped sermons. The parents alleged that by such conduct the pastor negligently failed to exercise the standard of care for a clergyman of his sect and training with the proximate result that Nally committed suicide. Count II, designated "NEGLIGENCE," alleged the church and the pastor were negligent in the failure to require proper psychological training for their lay spiritual counselors. Count III, designated "OUTRAGEOUS CONDUCT," alleged that the defendants church and pastor disparaged, ridiculed and denigrated the Catholic faith professed by the parents, and thereby exacerbated the feelings of guilt, anxiety and depression the son harbored, and that the exercise of undue influence over Nally prevented the son from contact or consultation with persons outside the church. These actions, the count alleged, amounted to outrageous conduct which proximately caused Nally to become further ridden with guilt, depression and anxiety as to drive him to take his life.

The trial court granted summary judgment against the petition. The majority of the court of appeals posed the question for review [204 Cal.Rptr. at 307]:

> We are thus confronted with the question whether a clergyman or church should be immune from liability for intentional infliction of emotional distress caused by the nature or content of counseling simply because the counseling may have a spiritual aspect.

The majority responded [204 Cal.Rptr. at 308 and 309]:

> [R]emedies should exist for harm caused by extreme and outrageous conduct even when such conduct involves the expression of religious beliefs.

. . . .

Because we have concluded that triable issues of fact remain as to whether Kenneth Nally's suicide was caused by intentional infliction of emotional distress, we need not also decide whether Pastor Mac-Arthur [the defendant pastor] had a duty to refer Kenneth Nally to a psychiatrist or other mental health professional or whether Pastor MacArthur or the church had a duty to adequately train the pastors in methods of psychological counseling.

Thus, the court of appeals majority resolved that a remedy exists for wrongful death caused by *intentional* infliction of emotional distress caused by a cleric, even though an incident of spiritual counseling. The majority left unanswered, however, the question posed by Count I ["Clergyman Malpractice"] of the petition: whether allegations that advice of a spiritual counselor to a parishioner with known suicidal tendency to confer only with church counselors about his state, and not with outside professionals, states a justiciable claim for clergy malpractice negligence.

■ The *intentional* torts of a cleric are already actionable, however, even though incidents of religious practice and belief. *Bear v. Reformed Mennonite Church*, 462 Pa. 330, 341 A.2d 105 (1975); *Carrieri v. Bush*, 69 Wash.2d 536, 419 P.2d 132 (1966). *See also Radecki v. Schuckardt*, 50 Ohio App.2d 92, 361 N.E.2d 543 (1976). Liability for such conduct does not clash with the free exercise clause of the First Amendment because conduct albeit promoted by religious belief is subject to regulation for the protection of society. That is the clear sense of *Cantwell v. State of Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) at 303, 60 S.Ct. at 903:

> The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Four-

teenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship ... On the other hand, it safeguards the free exercise of the chosen form of religion. *Thus, the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.* [emphasis added]

*Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) confirmed that whereas "the door of the free exercise clause stands tightly closed against religious *beliefs* as such," overt acts prompted by religious beliefs are not free from governmental regulation where the actions "posed some substantial threat to public safety, peace or order." *Id.* at 402–403, 83 S.Ct. at 1792–1793.

*Nally,* therefore, merely confirms that an *intentional* tort by a cleric may be actionable, albeit the conduct which occasioned the harm [here, pastoral counseling] is related to the exercise of religious belief. *Nally* leaves unresolved the unavoidable and more vexatious question: whether a theory of clergy malpractice inevitably implicates the *freedom to believe* aspect of the *free exercise clause,* and hence unduly involves courts in matters purely sacerdotal. That is because a theory of malpractice is defined in terms of the duty to act with that degree of skill and learning ordinarily used in the same or similar circumstances by members of that profession. MAI 11.06 [3d ed. 1981]. It is a theory of tort, therefore, which presupposes that every cleric owes the same duty of care, whatever the religious order which granted ordination, or the cleric serves, or the beliefs espoused. It is a theory of tort, moreover, which inevitably involves the court in

a judgment of the competence, training, methods and content of the pastoral function in order to determine whether the cleric breached the duty "to act with that degree of skill and learning ordinarily used in the same or similar circumstances by members of that profession." Thus, the question *Nally* leaves unanswered is whether pastoral counseling is so ineluctably a function of the particular religion that no one definition of its malpractice can evolve into a standard of professional performance, and is otherwise so purely sacerdotal a function, that it is both unfeasible as a theory of tort and not constitutionally permissible. *See,* for the full exposition of positions, *pro* and *contra,* Bergman, *Is the Cloth Unraveling? A First Look at Clergy Malpractice,* 9 San Fern. V.L.Rev. 47, 48 et seq. (1981) and Ericsson, *Clergyman Malpractice: Ramifications of a New Theory,* 16 Val.L.Rev. 163, 169 et seq. (1981).

The authority of *Nally* other than as an exposition of theory, whatever its undoubted impact, is clouded further by the order of the California Supreme Court that the opinion be decertified and be given publication without official status. *Nally v. Grace Community Church of the Valley,* 157 Cal.App.3d 912, 204 Cal.Rptr. 303 [asterisk footnote] (2d Dist.1984). On remand and retrial, the Nally parents proceeded on the theory of clergy malpractice for negligent counseling, and at the close of the presentation of that evidence, the motion of the defendants church and pastors for nonsuit on First Amendment grounds was sustained. The review of the judgment of nonsuit still pends.[6]

The viability of a clergy malpractice remedy for negligent counseling, nevertheless assumed, the petition brought by the Hesters as Count I does not allege the tort. That count pleads the sequence from the outset of the self-introduction by Pastor Barnett to the Hesters as a minister of the Baptist Church, his invitation to them to trust and confide in him, and his assur-

---

**6.** That chronicle of the litigation is as reported by counsel for the Nally parents in Barker, *Clergy Negligence, Are Juries Ready to Sit in Judgment?,* Trial (July, 1986).

ances that their confidences would not be divulged outside the family. The count then pleads the disclosure to the pastor of the behavioral problems of the three Wymer children, the invitation by the pastor to counsel the family to relieve the problems, the acceptance by the Hesters, and the breach of that confidence by the divulgence by Pastor Barnett to third persons of the confidences disclosed during counseling. The rest of the averments of Count I assert the state of mind which prompted the disclosures: that Pastor Barnett deliberately misrepresented to others the content of the Hester communications with him—and instructed the Wymer children to lie to others about the nature of the parental discipline "so that the children would eventualy [sic] be removed from plaintiffs' home," and [to that end?] "began a crusade and course of action which is continuing today and which is designed to defame plaintiffs in the community where they live, denouncing them as irreligious and abusive parents." These allegations of intentional disclosure of the confidential communications reposed in him during the family counseling, the animus which prompted them, and the malicious purposes intended, are all iterated as separate counts in terms of established intentional torts: defamation, alienation of affections, invasion of privacy, and the intentional infliction of emotional distress. These torts, however, do not depend for validity upon a standard of professional conduct found, imposed and breached [that is, a malpractice], but upon the duty the law imposes on every person to avoid injury to another.

■ What remains of the Count I as a pleading of clergy malpractice is the allegation that the defendant Barnett

> "acted contrary to ministerial ethics and against Missouri law in particular Section 491.060(H)—[sic, actually § 491.060(4), RSMo Cum.Supp.1987]—and against the standard of conduct imposed upon ministers of the gospel...."

It is the sense of that pleading—the Hesters expound in argument—that § 491.060(4), which renders a clergyman incompe-

tent to testify concerning a communication made to him in the professional character as spiritual advisor, imposes a "minimum standard for the profession," whose nonobservance constitutes both a malpractice and a breach of professional ethics. While the statute no doubt means to encourage an effective relationship between the spiritual advisor and the communicant, the enactment has no effect beyond its actual terms. *State v. Kurtz*, 564 S.W.2d 856, 860[10] (Mo. banc 1978). There is no intimation that § 491.060(4) intends any effect beyond a judicial proceeding—let alone a cause of action for the breach. The privilege, moreover, was not known at the common law, and hence the pleading cannot be understood to invoke any tort principle of that system of law to validate a malpractice action for its breach. *State v. Kurtz*, 564 S.W.2d at 860[10]; C. McCormick, Evidence § 72 (3d ed. 1984). The tradition that a spiritual advisor does not divulge communications received in that capacity, moreover, even if a tenet of "ministerial ethics" as Count I pleads, describes a moral, not a legal duty. In the absence of a legal duty, a breach of a moral duty does not suffice to invest tort liability. T. Cooley, Law of Torts § 3 (4th ed. 1932); J. Dooley, Modern Tort Law § 2.01, at 8 (1982 rev.); Restatement (Second) of Torts, §§ 4 and 5 (1965); *Linville v. Ripley*, 237 Mo.App. 1275, 173 S.W.2d 687, 690[5–8] (1943).

■ Count I does not allege a cause of action for clergy malpractice for negligent counseling, and was properly dismissed.

## COUNT II ALIENATION OF AFFECTIONS

The next sequence of pleading alleges as a separate count that the Hester husband and wife and the three Wymer children were bound together by love and affection, and that the minister, Barnett, intentionally and maliciously set out to alienate the affections of "one family member from the others." That pleading alleges that the minister advised the wife Hester, "Leave Harold and the doors of Clearmont will be opened to you," so as to imply that separa-

tion from her husband would gain the wife "the friendship of members of the community over whom the defendant claims to exercise influence and control." The pleading then alleges [albeit disjointedly in the causation and damages "count" of the petition] that as the direct and proximate result of the tortious conduct, "Hazel Hester ... lost the love, care companionship, consortium and trust of her husband."

That pleading also asserts that the minister intentionally and maliciously alienated the affections of the children from the mother and her husband, and from the children, *inter sese:* Lee Wymer declared to them: "Because of what the preacher has said about you, I do not have a brother or sister nor a mother or a father." Connie Wymer [the petition pleads] "will have nothing to do with her family, not even notifying plaintiffs of the birth of her child ... nor inviting them to visit her child." Don Wymer, first alienated from the Hesters, "has since changed his attitude gradually toward acceptance of the love of plaintiffs for him."

The tort of alienation of affections of a spouse, albeit discarded as a remedy in many states, remains intact in our jurisdiction. *Kraus v. Kraus,* 693 S.W.2d 869 (Mo.App.1985). The cause of action is delineated in *Gibson v. Frowein,* 400 S.W.2d 418, 421[3] (Mo. banc 1966):

"Alienation of affections is an intentional tort, and the elements of the cause of action are defendant's wrongful conduct, plaintiff's loss of the affections or consortium of his spouse, and the causal connection between such conduct of defendant and the loss by plaintiff."

Count II sufficiently pleads a cause of action for spousal alienation of affections in terms of that formulation, and the dismissal of that separate count was error. The answer the defendant pleads merely denies the allegations of Count II, but does not assert that the conduct described was privileged or was otherwise religious activity within the protection of the free exercise clause of the First Amendment. Conduct or actions which pose "some substantial threat to public safety, peace or order" may be subject to governmental regulation, even though prompted by religious beliefs or principles. *Sherbert v. Verner,* 374 U.S. at 403, 83 S.Ct. at 1793. The alienation of affections of one spouse from the other disrupts not only personal felicity but also undermines the family relationship. The intentional interference with that relationship by a third person, therefore, is a threat to the public welfare and order the law may redress, the right of the free exercise of religion notwithstanding. *Carrieri v. Bush,* 419 P.2d at 137[15, 16]; *Bear v. Reformed Mennonite Church,* 341 A.2d at 107[3]. Where, however, the interference involves merely the preachment of doctrine or advocacy of religious faith, without unlawful or improper motive, no paramount state concern is affected, and the alienation is not actionable. *Radecki v. Schuckardt,* 50 Ohio App.2d 92, 361 N.E.2d 543, 545[2] (1976); *Baugh v. Thomas,* 56 N.J. 203, 265 A.2d 675, 677[1] (1970). The alienation Count II pleads cannot be fairly understood to rest on exercises of the defendant minister purely sacerdotal, but rather malicious conduct—doctrine apart— to separate the wife from the husband. Count II stands as a sufficient pleading for the alienation of spousal affection cause of action.

Count II intermixes with the alienation of spousal affections pleading allegations by the Hesters of the alienation of the affections of the three Wymer children by the intentional and malicious conduct of Pastor Barnett. A *child* has been denied recovery for the alienation of the affections of the father [*Hale v. Buckner,* 615 S.W.2d 97 (Mo.App.1981) ], but the claim of a *parent* against a third person for the alienation of the affections of a child remains unaddressed by our courts. Those courts—save one—presented with such a claim have refused remedy. *See* Annotation, Right of a Child or Parent to Recovery for Alienation of Other's Affections, 60 A.L.R.3d 931 (1974). The refusal rests on concern that such a recovery would render the child a hostage in family disputes.

*Bock v. Lindquist,* ·278 N.W.2d 326, 328 (Minn.1979); *Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178, 1181[4, 5] (1984). The analogy of *Hale v. Buckner,* 615 S.W.2d 97 (Mo.App.1981), and the rationales of *Bock* and *Bartanus* suffice to refuse to extend the remedy to the alienated affections of a child. To the extent that Count II undertakes to plead a cause of action by the Hesters for the alienation of the affections of the three children, the order to dismiss Count II is sustained. To the extent the order undertakes to dismiss the Count II as a pleading by husband Hester for the alienation of the affections of wife Hester, it is reversed.

### COUNT III DEFAMATION OF CHARACTER

The petition next pleads a sequence of conduct "[s]ince the first day of January of 1984 ... only discovered by Plaintiffs since the first of this year" whereby the defendant "has undertaken to slander, libel and defame the character of Plaintiffs" and used every opportunity and means to publish and broadcast remarks intentionally and maliciously "designed to harm the character and reputation of Plaintiffs ... remarks ... repeated and republished by defendant time after time even to this day." The recitation then describes the slanders and libels and the occasions of publication; that the pastor

(a) delivered sermons from the pulpit of his church wherein the pastor "wrongfully accused Plaintiffs of crimes, stealing, abuse, physical and emotional cruelty to their [sic] spouse, her children and his stepchildren, Connie Wymer, Lee Wymer and Don Wymer"

(b) repeated these false remarks "[i]n letters, memos, church bulletins and publications"

(c) made reports to the Missouri Hot Line for Child Abuse of false accusations by the pastor that the plaintiffs abused the children and thereby subjected them to investigation by the Missouri Division of Family Services

(d) repeated these libels and slanders to neighbors of the plaintiffs in meetings the pastor organized and directed for that purpose

(e) uttered the specific untrue and defamatory remarks, among others, that

1. "Harold Hester is a thief who stole tools from a neighbor."

2. "Harold Hester does not pay his employees their earned wages."

3. "Harold Hester is an arsonist who burns down barns and other buildings."

4. "Harold Hester will cheat anyone out of anything."

5. "Harold Hester cheats the Government."

6. "Plaintiffs abuse their children mentally ·and physically."

7. "Plaintiffs do not love their children but use them to get work done."

8. "Plaintiffs beat their children so badly that they have bruises all over."

9. "Plaintiffs punish their children by forcing them to lie face down on the bed of a pickup truck and then drive it over plowed ground and bumpy roads."

10. "Plaintiffs whip their children in an excessive and abusive manner."

11. "Harold Hester tried to punish Connie Wymer by knocking her into a ditch and then using a bulldozer to cover her with dirt."

 The trial court ruled that these allegations did not state a cause of action for defamation. The court erred. False utterances which hold one up to hatred, contempt or ridicule, or cause the person to be shunned and avoided, or which "induce an evil opinion of one in the minds of right-thinking persons," are defamations actionable *per se.* W. Prosser, Law of Torts § 111, p. 739 (4th ed. 1971). A false imputation of crime, by that measure, is defamatory *per se,* as is a false imputation that a person is dishonest in the business relation, or—by very definition—the imputation that parents cruelly abuse their children. *Brown v. Kitterman,* 443 S.W.2d 146, 153[8] (Mo.1969). To be sufficient as a

pleading for libel *per se* the petition must set out the defamation published *in haec verba*—or, at the very least, a paraphrase of what is charged as the libel. *Lorenz v. Towntalk Pub. Co.,* 261 S.W.2d 952, 953[1–3] (Mo.1953); *Missouri Church of Scientology v. Adams,* 543 S.W.2d 776, 777[3, 4] (Mo. banc 1976); *Bremson v. Kinder-Care Learning Centers,* 651 S.W.2d 159, 160[4] (Mo.App.1983). The pleaded count for defamation attributes false statements delivered by Pastor Barnett, published and republished among the church membership and the community at large, which impute to Harold Hester the crimes of theft, arson and child abuse, dishonesty in business and cruelty to the children—and to Hazel Hester, the crime of child abuse and the practice of wanton cruelty upon the children. These utterances and publications are pleaded in detail and, if not verbatim, then in substantial paraphrase. Count III pleads actionable defamation. Rules 55.05 and 55.20.

Pastor Barnett contends nevertheless that Count III alleges neither "the time, place [nor] means" of the publications, and hence does not suffice as a libel *per se.* He argues that absent a declaration of these incidents of publication, a defendant is unable to respond whether the utterances the pleading attributes were privileged or not. It is not the time or place, as such, but "[t]he *occasion* which determines whether a publication of slander is privileged and whether the slander is, under the circumstances, absolutely or conditionally or qualifiedly privileged." *Williams v. School District of Springfield R-12,* 447 S.W.2d 256, 267 (Mo.1969). Count III defines the occasions for the publications: sermons from the pulpit of the church, letters and other written publications, reports to the Missouri Hot Line, and at convocations of neighbors the pastor contrived for that purpose. The pleaded response to Count III was, in fact, not only a denial of the allegations, but that the utterances were published "in the performance of his duties as a Minister of the Gospel and as a citizen." The sufficiency of Count III as a pleading for libel as-

sumed, therefore, the question which remains on the propriety of the trial court order to sustain the motion to dismiss that cause of action is whether the pleas of privilege are as to occasions of utterances which accorded Pastor Barnett absolute immunity of expression—whatever the motives which prompted them. *Id.* at 268[21, 22].

Privilege, absolute or qualified, is a complete defense against liability for libel. W. Prosser, Law of Torts § 114 (4th ed. 1971). A qualified privilege is conditioned upon good motive. Publications uttered with malice forfeit the immunity of the privilege. Malice, however, does not destroy an absolute privilege. *Laun v. Union Electric Co.,* 350 Mo. 572, 166 S.W.2d 1065, 1068[2, 3] (1942). Absolute immunity as to defamatory publications is confined to the few situations "where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." W. Prosser, Law of Torts § 114, at 777. Absolute privilege ensures the public policy of freedom of speech " 'where it is essential that freedom of speech should exist.' " *Laun v. Union Electric Co.,* 350 Mo. at 578, 166 S.W.2d at 1071[11]. The occasions for the absolute privilege are limited and extend to judicial, legislative or executive proceedings [among others], and "to occasions where the communication is provided for and required by law." *Pulliam v. Bond,* 406 S.W.2d 635, 640[1, 2] (Mo.1966). The immunity from the utterance of false speech may also be a matter of constitutional privilege. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The responsive pleading of Pastor Barnett invokes privilege for the defamations alleged by Count III on grounds that the utterances were published "in the performance of his duties as a Minister of the Gospel and as a citizen." Reports of child abuse or neglect are protected by privilege under § 210.135, RSMo 1978, the pleading alleges, and hence Count III does

not state a cause of action for defamation as to those utterances. The immunity from liability that statute grants is not absolute, however, as the pleading implies. It is qualified and conditional. It protects "[a]ny person, official, or institutions complying with the provisions of [the Child Abuse Act] in the making of a report … [against] any liability, civil or criminal, that otherwise might result by reason of such actions. *Provided, however, any person intentionally filing a false report shall not have immunity, from any liability, civil or criminal.*" § 210.135 [emphasis added]. A qualified privilege "is conditioned upon good motives and reasonable behavior and is forfeited if it is abused." *Williams v. School District of Springfield R–12,* 447 S.W.2d at 268[21, 22]. The statute itself defines the "reasonable behavior" concomitant of the privilege: that the report of abuse or neglect be free of intentional falsehood. Count III pleads expressly:

> The Defendant, knowing that the reports were false, called the Missouri Hot Line for Child Abuse and reported Plaintiffs falsely accusing them of child abuse [in the particulars separately pleaded] and causing them to be the subject of an investigation by the Missouri Division of Family Services.

Those averments of Count III attribute to Pastor Barnett statements and publications of child abuse practiced by the Hesters on the children, reports known to be false when made, and hence defamatory and beyond the immunity the statute grants.

■ As to the remainder of the statements alleged by Count III against the defendant as defamations, Pastor Barnett invokes, in defense, "the privilege due a Minister of the Gospel in the performance of his duties." He pleads an absolute privilege against liability as to such communications under the First Amendment mandate of separation of church and state. The First Amendment, however,—as *Cantwell v. State of Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, holds—encompasses the freedom to believe and the freedom to act. Only the freedom to believe is

absolute. The freedom to act remains subject to regulation for the protection of society. The courts do not hesitate—as our discussion notes—to impose tort liability upon ministers and churches where the religious conduct otherwise protected "posed some substantial threat to public safety, peace or order." *Sherbert v. Verner,* 374 U.S. at 403, 83 S.Ct. at 1793. It is the freedom to believe the law protects absolutely, and not always how the belief is acted out—whatever the injury to others. Thus, where the truth or falsity of religious belief becomes the object of judicial redress, the inquiry "enter[s] a forbidden domain." *United States v. Ballard,* 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). That is because the First Amendment protects religious belief. "Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or belief." *Id.* at 86, 64 S.Ct. at 886. A defense based on the Free Exercise Clause, therefore, presents a concern in an action for defamation which does not inhere in the other formulations of tort the petition asserts against Pastor Barnett. That is because defamation involves the truth or falsity of published speech and published speech is a usual means to propagate religious belief. *Christofferson v. Church of Scientology,* 57 Or.App. at 236, 644 P.2d at 598[8].

■ A defamation injures reputation, and false accusation of crime, of dishonesty in business, and of primitive cruelty to one's children do severe damage to the personality, dignity and sensibility of the one accused. The denial of legal recourse in such cases engenders a sense of unfairness and frustration in the persons injured and, left unrequited, tends to fester into a substantial threat "to public safety, peace or order." A court, as the organ of government to which a citizen turns for redress of wrongs, therefore, may justly allow the vindication of the right to reputation without constitutional infringement— albeit the words and conduct of defamation were uttered in a religious setting. *Sherbert v. Verner,* 374 U.S. at 403, 83 S.Ct. at

1793; *Bear v. Reformed Mennonite Church,* 341 A.2d at 107. It is only *religious* belief and practice the free exercise clause protects absolutely against governmental regulation, and not *secular* belief and practice. *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925). The claim and proof of defamation, therefore, may not involve the truth or falsity of statements of religious belief or tenet made by Pastor Barnett. They may show, however, that although delivered in the milieu of religious practice, the beliefs asserted as religious were not held as such in good faith, but were used to cloak a secular purpose: in this case, to injure reputation. *United States v. Ballard,* 322 U.S. at 85–86, 64 S.Ct. at 885–886; *Founding Church of Scientology v. United States,* 409 F.2d 1146, 1162 (D.C.Cir. 1969). The statements alleged by Count III are not of the kind inherently and invariably expressions of religious belief or religious purpose so as to come under the absolute protection of the free exercise clause against governmental regulation. They are not of the kind, therefore, as to which judicial remedy constitutes an undue burden on the free exercise of religion.

■ Our decision rests on the assumption that the Hesters were not members of the church served by Pastor Barnett. The petition alleges only that Pastor Barnett presented himself to them as the minister of the Baptist Church in Clearmont and invited the Hesters to confide in him. They responded with the confidences about the problems with the children. There is no intimation in the petition or answer that the Hesters were members of the Clearmont Church, or that they subjected themselves to the doctrine, religious practices or discipline of the church or its congregation. Among the defamations Count III alleges against the pastor were statements made in the course of sermons delivered from the pulpit. The free exercise clause forbids a court from any evaluation of the "correctness" of the content of religious sermons as expressions of belief or religious practice. *Fowler v. State of Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953). The stricture of the free exercise clause is against "any governmental regulation of religious *beliefs* as such." *Sherbert v. Verner,* 374 U.S. at 402, 83 S.Ct. at 1792. It is competent, therefore, for a court to inquire whether the sermon declarations that the Hesters stole, committed arson and abused their children were expressions of actual creed and practice, held and exercised in good faith, or were merely the religious occasion for the wholly secular purpose of intentional defamation and injury to reputation of persons not even communicants of the church.

■ It may be that the statements from the pulpit, and the several others asserted against Pastor Barnett as defamations, were a form of chastening usual as to wayward members and conformable to the liturgy, discipline and ecclesiastical policy of the church and congregation. If so, and if the Hesters were members of that religious body, they presumptively consented to religiously motivated discipline practiced in good faith. *Rosicrucian Fellowship v. Rosicrucian Nonsectarian Church,* 39 Cal.2d 121, 245 P.2d 481, 487–488 (banc 1952) states the principle:

> " 'It is perfectly clear that, whatever church relationship is maintained in the United States, is not a matter of status. It is based … on voluntary consent … It is "one of contract," and is therefore exactly what the parties to it make it and nothing more. A person who joins a church covenants expressly or impliedly that in consideration of the benefits which result from such a union he will submit to its control and be governed by its laws, usages and customs whether they are of an ecclesiastical or temporal character to which laws, usages, and customs he assents as to so many stipulations of a contract.' "

The consent to submit to the discipline of the church, sect, or congregation is one of contract, therefore, between the member and the religious body. The discipline the

religious body may impose, accordingly, must be within the terms of the consent. Damage incurred within the terms of consent is a nontortious consequence. "It is a fundamental principle of the common law that *volenti non fit injuria*—to one who is willing no wrong is done." W. Prosser, The Law of Torts § 18 (4th ed. 1971); 86 C.J.S. Torts § 12 (1954).

The statements from the pulpit, and the others, moreover—if as to members and if as expressions, bona fide, of the religious practice of the church or congregation—are privileged as communications enjoined by duty [upon the pastor] to persons [church members] with a corresponding interest or duty. *Kersting v. White*, 107 Mo.App. 265, 80 S.W. 730, 734 (1904); *Haynes v. Robertson*, 190 Mo.App. 156, 175 S.W. 290, 293[9] (1915); Restatement (Second) of Torts § 596, comment e (1977). The privilege, however, is qualified, and is lost if the plaintiffs prove the defendant acted with the intention to injure the plaintiffs in reputation, feelings or profession. *Kersting v. White*, 80 S.W. at 734; Annotation: Defamation—Religious Activities, 87 A.L.R.2d 453 (1963); C. Zollman, American Civil Church Law at 392 (1917). The use of the pulpit as the pretext for the practice of religion, but as the occasion for intentional defamation, therefore, is neither justified by privilege nor protected by the free exercise clause.

We construe Count III, given its best intendments, to plead a cause of action against Pastor Barnett in defamation. The burden to prove the defense of privilege—qualified or absolute—rests on the person who asserts the privilege. *Williams v. School District of Springfield R–12*, 447 S.W.2d at 265[7, 8]. If the evidence shows consent to the defamations, there was no tort proven. The proof may show otherwise that the statements the Hesters claim as defamations were, as a matter of law, expressions of religious belief or so nearly so in practice that they come under the absolute protection of the free exercise clause. If so, the issue of defamation will not be submissible. We hold only that Count III pleads a justiciable claim for defamation.

## COUNT IV INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The rubric notwithstanding, Count IV pleads expressly the tort of extreme and outrageous conduct as introduced in *Pretsky v. Southwestern Bell Telephone Company*, 396 S.W.2d 566 (Mo.1965). The gist of the tort is the intentional infliction of emotional distress on another by conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 568, 569; Restatement (Second) of Torts § 46, comment d (1965). It is conduct so extreme as to exceed any reasonable limit of social toleration. *Frye v. CBS INC*, 671 S.W.2d 316 (Mo.App.1984).

Count IV pleads that:

20. Defendant, "with malicious intent to cause plaintiffs emotional distress intentionally did those actions described specifically in other Counts knowing that Plaintiff Hazel Hester was nervous and suffered frequent and severe attacks of depression and knowing Plaintiff Harold Hester suffered from high blood pressure and nervous tension and was subject to heart attacks all with the malicious design to cause emotional distress and aggrivate [sic] plaintiffs' known physical ailments all to their damage as hereafter more specifically described."

The allegations do not suffice as a pleading for the extreme and outrageous cause of action. However dismal the motives and however censurable the designs, the conduct pleaded is not extreme and outrageous, and therefore is not tortious—unless the allusion to "those actions described specifically in other Counts" aid the pleaders. *Id.* Those allegations, already recapitulated, recite breach of confidence, incidents of alienation of affections, of defamation, of invasion of privacy, and of interference with contract. These counts are each pleaded as disparate causes of action.

Rule 55.12 allows a pleader to adopt by reference statements "in a different part of the same pleading or in another pleading or in any motion." The rule replicates Rule 10(c) of the Federal Rules of Civil Procedure. The adoption by reference technique is designed to avoid the repetition and redundancy characteristic of the common law system of pleading. 2A Moore's Federal Practice § 10.05 (2d ed. 1985). The adoption by reference, however, must subserve the dominant objective of the rules of pleading: that "[e]ach averment of a pleading shall be simple, concise and direct" [Rule 55.04], and that "[a] pleading ... shall contain ... a short and plain statement of the facts ..." [Rule 55.05]. The adoption by reference procedure, therefore, does not dispel the requirement that the pleading—as enhanced by the reference adopted—be "simple, concise and direct." That is because the function of pleadings is to "present, define and isolate controverted issues so as to advise the trial court and the parties of the issues to be tried and to expedite the trial of the cause on the merits." *Pillow v. General American Life Ins. Co.*, 564 S.W.2d 276, 280[2, 3] (Mo.App.1978). A reference not sufficiently clear and explicit to advise the adversary of the issue tendered for trial, therefore, is not effective as an incorporation or pleading. *Texas Water Supply Corp. v. Reconstruction Finance Corp.*, 204 F.2d 190 (5th Cir.1953).

The quandary the adoption by reference Count IV presents the adversary pleader is evident. Count IV attempts the extreme and outrageous conduct cause of action. A glance at the composite petition discloses averments of conduct attributed to Pastor Barnett, indeed extravagant and socially censurable to the extreme: that Pastor Barnett falsely accused the Hesters of crimes: "Harold Hester is a thief who stole tools from a neighbor"; "Harold Hester will cheat anyone out of anything," etc. Also, that Pastor Barnett falsely reported and accused the Hesters on the Missouri Hot Line of child abuse and so caused them to be the subject of investigation. Also, that the Hesters were inhumanly cruel to the children: "Plaintiffs [the Hesters] punish their children by forcing them to lie down on the bed of the pickup truck and then drive it over plowed ground and bumpy roads"; "Harold Hester tried to punish Connie Wymer by knocking her into a ditch and then using a bulldozer to cover her with dirt," etc. These and other like attributions of infamous conduct were alleged against Pastor Barnett in Count III—*as defamations*. That pleading attributes these and the numerous others to Pastor Barnett, as false publications made with the intent to injure reputation, delivered from the pulpit, in church circulations, at meetings convoked for that purpose, and on other occasions. Those statements and publications as alleged in Count III constitute *defamation*, and only defamation. "[A]ny action seeking damages for an untrue statement should be in libel." *Barber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291 (1942). To allow defamation Count III to be incorporated into extreme and outrageous conduct Count IV would be to allow—not an alternative remedy—but a redundant and duplicate remedy. *Cf.* Rule 55.06(a).

The composite pleading, exclusively of Causation and Damages Count VII, consists of a sequence of forty-nine enumerated separate recitations—paragraphs and subparagraphs. These are interspersed among six formulations of tort—negligent and intentional. It would have been simple for the pleader merely to specify by number or letter the enumerated allegations the plaintiffs meant to incorporate. It is not the role of the defendant to define the cause of action for the plaintiffs, and then to defend against it. Nor is it the role of the court on a motion to dismiss to shape extraneous recitations in other counts into a cause of action to match the rubric for remedy the pleader attributes. The attempted incorporation by reference by allusion to "those actions described specifically in other Counts" does not inform the defendant as to the nature and extent of the incorporation, and hence is ineffective as an adoption by reference under

Rule 55.12. *See Heintz & Co. v. Provident Tradesmen's Bank & Trust Co.*, 29 F.R.D. 144, 145[4, 5] (E.D.Pa.1961). Count IV was properly dismissed for failure to state a cause of action.

## COUNT V INVASION OF PRIVACY

The right to privacy as a general doctrine of tort was recognized by our Supreme Court in *Barber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291 (1942). The general right to privacy, our Supreme Court en banc then held in *Sofka v. Thal*, 662 S.W.2d 502 (Mo. banc 1983), expressed four separate interests, and the invasion of privacy described four different torts, each with distinct elements. *Sofka* [at 510] adopted the Restatement (Second) of Torts § 652B (1977) formulations that the right to privacy is invaded when there is

(1) unreasonable intrusion upon the seclusion of another

(2) appropriation of the other's name or likeness

(3) unreasonable publicity given to the other's private life

(4) publicity that unreasonably places the other in a false light before the public.

In its delineation of the action for invasion of privacy, *Barber* determined [348 Mo. at 1208, 159 S.W.2d at 296[12–15]] that "truth or untruth is not an issue." "[A]ny action seeking damages for an untrue statement should be in libel." *Sullivan v. Pulitzer Broadcasting Company*, 709 S.W.2d 475 (Mo. banc 1986) adopted the *Barber* rationale that the proper remedy for the publication of *untrue* private facts is defamation, to deny redress to a claim formulated on the false light invasion of privacy theory, but actually "nothing more than the classic defamation action where one party alleges that the other published a false accusation concerning a statement of fact—in this case, a charge of criminal conduct or wrongdoing." *Id.* at 481.

Count V pleads:

21. Defendant has intruded upon plaintiffs' solitude and seclusion by entering into plaintiffs' home under the disguise [sic] of helping them and their family through family counselling and assistance with the children's behavior problems when defendant's true motive was to harm plaintiffs and for which he would not have been permitted into their home had plaintiffs known defendant's true motive.

22. Defendant has made public by reporting to School Authorities, Juvenile Authorities, Law Enforcement Authorities and the Hot Line for Child Abuse certain untrue accusations, more specifically stated in other Counts hereof [7] for the intended purpose of disturbing the privacy of plaintiffs, subjecting them to intrusion by investigators, social workers, psychologists and law enforcement officers intruding upon their solitude and seclusion all to their damage as hereafter more specifically set forth.

▬▬▬ The Hesters say that ¶¶ 21 and 22 plead the essential elements of three invasion of privacy torts: (1) unreasonable intrusion upon the seclusion of another (2) unreasonable publicity given to the other's private life (3) publicity that unreasonably places the other in a false light before the public. Count V pleads two components of facts: ¶ 21 relates to invasion of privacy by conduct, without publicity or publication of words; ¶ 22 relates to an invasion of privacy by public disclosure of private facts. The unreasonable intrusion upon the seclusion of another tort encompasses three elements: (1) the existence of a secret and private subject matter; (2) a right in the plaintiffs to keep that subject matter private; and (3) the obtainment by the defendant of information about that subject matter through unreasonable means. *Corcor-*

---

7. The adoption by reference into Invasion of Privacy Count V of "certain untrue accusations, more specifically stated in other Counts hereof" can allude only to ¶ 14d which contains those allegations of untrue accusations, and so validly accomplishes the incorporation under Rule 55.-12.

*an v. Southwestern Bell Telephone Co.,* 572 S.W.2d 212, 215[6] (Mo.App.1978). Publicity is not an element of that tort. *Sofka v. Thal,* 662 S.W.2d at 510. Count V, ¶ 21, sufficiently pleads the tort. It is the sense of that pleading that Pastor Barnett gained access to the Hester home through the pretense as counselor to assist in the correction of the children's behavior, when the true motive was to harm the Hesters by the disclosure of the information obtained through that guile. These allegations, taken as true, describe a substantial interference with seclusion and of the kind decidedly offensive to reasonable persons. *Corcoran v. Southwestern Bell Telephone Co.,* 572 S.W.2d at 215[7]. *See* Restatement (Second) of Torts § 652B, commend d (1977). It was error for the trial court to dismiss Count V.

 Count V, ¶ 22, however, suffices neither as a statement of claim for the unreasonable publication of private facts tort,[8] nor for a false light invasion of privacy. The tort of invasion of privacy is not a species of defamation. Where the claim for recovery on either theory—the publication of private facts or a false light invasion of privacy—involves *untrue* statements, the appropriate remedy is by defamation. *Barber v. Time,* 159 S.W.2d at 296; *Sullivan v. Pulitzer Broadcasting Co.,* 709 S.W.2d at 478. The allegations of ¶ 22 are as those before the court in *Sullivan:* "the classic defamation action where one party alleges that the other published a false accusation concerning a statement of fact—in this case, a charge of criminal conduct or wrongdoing." 709 S.W.2d at 478. [The very subject of ¶ 22 was, in fact, one of the pleaded grounds [¶ 14–d] of defamation Count III].

 Count V pleads injury to the Hesters from a course of intentionally tortious action by a minister, on an occasion only pretextually religious, but actually entirely

secular, and hence not offensive to the free exercise clause.

Count V is reinstated as a pleading for the intrusion upon seclusion invasion of privacy tort.

## COUNT VI TORTIOUS INTERFERENCE WITH CONTRACT

Count VI pleads:

23. Defendant has enticed, harrassed, intimidated, threatened and caused employees of Plaintiffs to leave their employ thereby rendering Plaintiffs unable to employ and maintain the necessary labor to conduct their farming business, their earth moving and construction business and their business of building and maintaining a lake and airplane landing strip on Plaintiffs' south farm.

24. Defendant's said actions are continuing today through the harrassment, intimidation and threats against plaintiffs' only remaining employee, Mack Ellison.

25. Defendant's actions are intentional and malicious and calculated by defendant to harm plaintiffs' businesses and in fact harming his businesses by causing their employees to quit their employ and thereby damage plaintiffs as more specifically set forth in the last paragraph hereof.

 The elements of a cause of action for tortious interference with contract or business relations are repeated in *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524, 529[1, 2] (Mo.App.1981):

(1) a contract or valid business relationship or expectancy

(2) knowledge by the defendant of the contract or relationship

---

8. *Corcoran v. Southwestern Bell Telephone Co.,* 572 S.W.2d at 214[3] delineates as the elements of the public disclosure of private facts tort: (1) publication (2) absent any waiver of privilege (3) of private matters in which the public has no legitimate concern (4) such as to bring shame or humiliation to a person of ordinary sensibility.

(3) intentional interference by defendant which induces the breach of contract or relationship

(4) Absence of justification

(5) resulting damages

Count VI suffices to plead the cause of action, and the dismissal was error. *Eib v. Federal Reserve Bank of Kansas City,* 633 S.W.2d 432, 435[2] (Mo.App.1982). It is enough that the petition plead a business relationship, present or future, with which the defendant has knowingly interfered, without justification, to the damage of the pleaders. *Casterline v. Stuerman,* 588 S.W.2d 86, 88 (Mo.App.1979). The *proof,* of course, must show an intent and primary purpose in the actor to interfere and to cause the result the interference augurs. *Francisco v. Kansas City Star,* 629 S.W.2d at 530[6]. The *proof* of the cause of action must also show that the interference was without justification—that is to say unprivileged as well as unlawful. *Id.* at 533–534[8–11]. The petition pleads that the interference was "intentional, malicious and calculated by defendant to harm plaintiffs' businesses … by causing their employees to quit their employ and thereby damage plaintiffs." The petition pleads also that the interference was accomplished by enticements, harassments, intimidations and threats so as to cause the employees to leave and hamper the plaintiffs in the conduct of their businesses. Those allegations, conjoined with the others, suffice to plead a prima facie cause of action of the intentional interference with a known contractual and business relationship with the intent to injure and without justification. It is not significant to the cause of action that the employments the defendant disrupted were at will [as we assume from the allegations]. It is the reasonable expectancy of persons who contract at will that the subsistent relationship will continue into the future unless terminated *inter sese.* That does not justify a third person, without privilege, to induce the breach with the purpose to do injury to a party to the contract. Restatement (Second) of Torts § 766. comment g. *Cook v. MFA Livestock Association,* 700 S.W.2d 526, 528–529 (Mo.App.1985); *Alyeska Pipeline Service v. Aurora Air Service,* 604 P.2d 1090, 1093 (Alaska 1979); Dobbs, *Tortious Interference with Contractual Relationships,* 34 Ark.L.Rev. 335 (1981). In the context of the pleading, those allegations, moreover, were merely part of the design to interfere with business relations and to subvert going enterprises.

These allegations of unlawful enticements, intimidations and threats—whatever the actual proof—describe secular conduct, the pretext of religious purpose notwithstanding, and hence state a cause of action outside the scope of the free exercise clause.

The dismissals of Ministerial Malpractice Count I and Extreme and Outrageous Conduct Count IV are affirmed. The dismissals of Alienation of Affections Count II, Defamation Count III, Invasion of Privacy Count V, and Tortious Interference with Contract Count VI are reversed, and those counts are ordered reinstated. Count II is reinstated as a cause of action for alienation of spousal affection, and Count V is reinstated as a cause of action for the invasion of privacy by the unreasonable intrusion upon the seclusion of another. The costs are allocated equally between the plaintiffs and the defendant.

All concur.