**Thomas DIEHL and Barbara Diehl,**
**Plaintiffs/Appellants,**

v.

**FRED WEBER, INC.,**
**Defendant/Respondent.**

**No. ED 92843.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 26, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 8, 2010.

Application for Transfer Denied
May 25, 2010.

**314**

Michael D. Quinlan, St. Louis, MO, for Appellant.

Lawrence F. Hartstein, Hartstein Law Firm, P.C., Clayton, MO, Winthrop B. Reed, III, Lewis, Rice & Fingersh, L.C., St. Louis, MO, for Respondent.

Before GLENN A. NORTON, P.J., and MARY K. HOFF, J., and LAWRENCE E. MOONEY, J.

PER CURIAM.

## OPINION

Thomas Diehl (Mr. Diehl) and Barbara Diehl (Wife) (collectively referred to as the Diehls) appeal from the trial court's grant of summary judgment in favor of Fred Weber, Inc., (Weber) on the Diehls' petition alleging malicious prosecution, abuse of process, intentional infliction of emotional distress, and prima facie tort. We reverse and remand in part and affirm in part.

### Factual and Procedural History

This appeal arises from a lawsuit originally filed by Weber alleging that Mr. Diehl had defamed Weber. The relevant facts are as follows:

Weber owned a sanitary landfill and a parcel of property where a proposed trash transfer station was to be built and operated. Both the landfill and the property were located in St. Louis County. Weber filed an application with the St. Louis County Department of Health to construct and operate the trash transfer station. The Department of Health held a public hearing, as required by law, regarding the proposed trash transfer station. It was alleged that Mr. Diehl distributed a flyer to people that attended the public hearing. The flyer stated, in pertinent part, "STOP FRED WEBER, INC.[,] ... THE TRASH TERRORISTS." The flyer instructed persons to contact the director of St. Louis County's Department of Health, the county executive, the director of St. Louis County's Department of Planning, or a group called Subdivision Fee Collectors, Inc., which was organizing the public opposition to the trash transfer station. Neither Mr. Diehl's nor Wife's name appeared on the flyer.

The following day, Weber's chairman of the board and chief executive officer, Thomas P. Dunne, Senior, (Dunne, Sr.,) found one of the flyers on his desk. Dunne, Sr., had not been present at the public hearing. Dunne, Sr., believed that the flyer "was probably the lowest blow and most outrageous thing ... leveled at the company" in the 42 years he had been with Weber. Dunne, Sr., was angry because he believed the flyer's language harmed Weber's reputation. A day or two later, Dunne contacted Weber's attorneys because he was "looking for any kind of legal remedies that could, one, stop the flyer from being circulated; two, stop being called a terrorist; and, three, to find out at that time who was the person who originated it." Dunne, Sr., gave Weber's attorneys "marching orders" and told them to obtain "whatever legal remedies possible, to stop the dissemination of [the flyer] ... and the use of the word terrorist and

to find out who put this together, period." As far as Dunne, Sr., was concerned, the attorneys did not need to secure his approval before taking any particular action with regard to the legal remedies they decided to pursue because "[w]hatever it took to accomplish [those] legal remedies, that was their ... call."

Twelve days after the public hearing, Weber filed suit against Subdivision Fee Collectors, Inc., and certain unknown and unidentified John Does, alleging the flyer was defamatory. Approximately two months later, Weber filed its first amended petition (First Amended Petition), adding Mr. Diehl as a defendant. Weber's First Amended Petition included four counts alleging disparagement, business defamation, libel and slander, and civil conspiracy. The First Amended Petition specifically alleged, in part:

17. After the horrendous, horrifying and frightening sneak terrorist attacks against the United States on September 11, 2001, the term "terrorist" carries with it a strong connotation of acts of injuring and killing innocent people by fanatics who hate the United States.

18. In pertinent part, the offending flyer interfered with [Weber's] landfill business by directing the customers of the trash hauler/collectors with whom [Weber] does business with (sic) or has contracts and agreements to use trash haulers/collectors that have contracts and agreements with competitors of [Weber].

. . .

24. The false, libelous and slanderous statements of Defendants and the false innuendo surrounding them naturally and proximately led persons to whom the false, libelous and slanderous statements were published to believe that [Weber] has killed and injured people or that the proposed South Transfer Station would kill and injure people and that [Weber] was unethical, immoral and disreputable in its business dealings.

. . .

28. The publication, dissemination and distribution and utterance of the false, libelous and slanderous statements by Defendants impugned and damaged the reputation of [Weber] in that many businesses accustomed to dealing with Weber either ceased dealing with, threatened to cease dealing with or diminished their business dealings with [Weber] whereby [Weber] has been deprived of its trade and the reasonable profits which it would have enjoyed but for the publication, dissemination, distribution and utterance of the false, libelous and slanderous statements.

Weber further alleged that, due to the actions of Subdivision Fee Collectors, Inc., and Mr. Diehl, it had sustained actual damages in excess of $100,000 and was entitled to punitive damages of $5 million. Weber also sought a permanent injunction enjoining and prohibiting Subdivision Fee Collectors, Inc., and Mr. Diehl or anyone acting on their behalf from further publishing, disseminating, or distributing the flyer.

Mr. Diehl filed a motion to dismiss the First Amended Petition for failure to state a claim, which the trial court denied. Mr. Diehl then sought relief through a writ of prohibition, which this Court granted in *State ex rel. Diehl v. Kintz*, 162 S.W.3d 152 (Mo.App. E.D.2005) (*Diehl I*). There, we found that Weber had failed to state a claim for defamation because the language used in the flyer, particularly the words "TRASH TERRORISTS," was not defamatory but was "imaginative expression or rhetorical hyperbole." *Diehl I*, 162 S.W.3d at 156. We reasoned that, taken in context and considering the circumstances, i.e., the flyer was distributed at a public

hearing regarding a controversial issue, a reader of the flyer would not actually believe Weber was a terrorist but would recognize the language as voicing the "writer's staunch opposition to the proposed trash transfer station." *Id.* at 156. Consequently, we also found that Weber had failed to state a claim for civil conspiracy because there existed no underlying act or tort upon which such a claim could be based. *Id.* at 156–57. In granting the writ of prohibition, this Court considered the "chilling impact that might be suffered in public discourse" if Weber's "meritless action" was allowed to proceed. *Id.* at 157.

Following this Court's mandate in *Diehl I*, the Diehls filed their five-count petition in the instant case, alleging intentional infliction of emotional distress, malicious prosecution, abuse of process, prima facie tort, and negligent infliction of emotional distress. The Diehls further alleged that Weber had filed its previous suit in order to intimidate them and other citizens from voicing their opposition to the proposed trash transfer station.

Later, the Diehls voluntarily dismissed without prejudice their claims for negligent infliction of emotional distress. Mr. Diehl also dismissed without prejudice his claim for prima facie tort. Wife, who was not a named defendant in Weber's lawsuit, dismissed without prejudice her claims for malicious prosecution and abuse of process. Weber filed a motion to dismiss the Diehls' claims for intentional infliction of emotional distress, which the trial court granted on the ground that such claims could not stand as separate causes of action along with the Diehls' other tort claims. Weber then filed motions for summary judgment as to Mr. Diehl's claims for malicious prosecution and abuse of process and as to Wife's claim for prima facie tort. In separate orders, trial court judges

granted Weber's motions for summary judgment.

In the order granting summary judgment in favor of Weber on Mr. Diehl's malicious prosecution and abuse of process claims, Judge Dowd found that Dunne, Sr.'s, role in instigating the previous lawsuit against Mr. Diehl was limited to making the final decision to proceed and that Dunne, Sr., was not specifically aware of Mr. Diehl's identity. Judge Dowd further found that the details of the defamation lawsuit, and the manner in which it was prosecuted, were left to Weber's attorneys and that the record did not indicate the defamation lawsuit had been filed without a factual basis or in bad faith. Judge Dowd concluded that Weber's decision to instigate and maintain the defamation lawsuit against Mr. Diehl was reasonable because Weber and its attorneys believed "the remarks in the flyer were defamatory in the first instance." Judge Dowd also concluded that the "fact that the words were later determined not to be legally defamatory [did] not change the original purpose of the [defamation] suit," which Weber claimed was to stop the harm allegedly being done to its reputation as a result of the flyer's characterization of the company as a "terrorist."

Mr. Diehl thereafter filed a motion to vacate the summary judgment on his malicious prosecution and abuse of process claims, along with a submission of additional material facts in opposition to Weber's motion for summary judgment. After hearing arguments, Judge Dowd denied the motion to vacate.

Several months later, Judge Dierker, subsequently entered the order granting summary judgment in favor of Weber on Wife's claim for prima facie tort, finding that Wife's claim was "purely based upon the filing of the underlying Lawsuit against [Mr. Diehl] by Weber" and that

Wife's claim was, therefore, dependent on the viability of Mr. Diehl's malicious prosecution and abuse of process claims. Judge Dierker acknowledged Judge Dowd's earlier order granting summary judgment in favor of Weber but expressed "some doubt" regarding the correctness of the prior ruling:

> Were the Court writing on a blank slate, it might very well conclude that the malicious prosecution claim is viable and that [Wife's] remedy is not prima facie tort, but loss of consortium arising out of the malicious prosecution tort inflicted upon her husband. However this Court is constrained by the prior rulings in this case as a matter of custom and practice, in the interests of the administration of justice.

Judge Dierker thereafter concluded that summary judgment was appropriate because Wife's prima facie tort claim was based solely on Mr. Diehl's previously-extinguished claims for malicious prosecution and abuse of process. Judge Dierker also concluded that all counts of the Diehls' petition had been disposed of and that Weber was, therefore, entitled to final judgment.

This appeal of the two summary judgments followed. Additional facts will be discussed as necessary to our analysis of the issues on appeal.

### Malicious Prosecution, Abuse of Process, and Prima Facie Tort Claims

Because the Diehls' first and second points on appeal concern claims that were disposed of through summary judgment, those claims are governed by the same standard of review. Therefore, we address those claims together.

In their first point, the Diehls contend the trial court erred in granting summary judgment in favor of Weber on Mr. Diehl's malicious prosecution and abuse of process claims. The Diehls argue that the claims should have been submitted to a jury because Weber's statement of uncontroverted material facts in support of its motion for summary judgment failed to show that there were undisputed material facts regarding either claim or the facts necessary to support Weber's affirmative defense of advice of counsel.

In their second point, the Diehls contend the trial court erred in granting summary judgment in favor of Weber on Wife's prima facie tort claim because the trial court improperly based its ruling on the earlier summary judgment on Mr. Diehl's malicious prosecution and abuse of process claims.

Whether the trial court's grant of summary judgment was proper is a question of law, which we review *de novo. Todd v. Missouri United School Ins. Council,* 223 S.W.3d 156, 160 (Mo. banc 2007); *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper only when the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 74.04(c); *Todd,* 223 S.W.3d at 160. Where the defending party is the movant, it may establish a right to judgment by showing: 1) facts negating any one of the non-movant's elements facts; 2) that the non-movant, after an adequate period of discovery, has not been able and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the non-movant's elements; or 3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *ITT,* 854 S.W.2d at 381. Most importantly, we review the record in the light most favorable to the party

against whom summary judgment was entered. *ITT*, 854 S.W.2d at 376. We take as true the facts set forth by affidavit or otherwise in support of the moving party's motion unless contradicted by the nonmoving party's response. *Ehrhardt v. Herschend*, 294 S.W.3d 58, 59 (Mo.App. S.D. 2009). We accord the non-moving party the benefit of all reasonable inferences from the record. *Ehrhardt*, 294 S.W.3d at 59. Furthermore, where competent materials in the record show there are two plausible but contradictory accounts of the necessary facts, there exists a genuine issue for trial. *Risher v. Farmers Ins.*, 200 S.W.3d 84, 88 (Mo.App. E.D.2006).

First, the Diehls argue that Weber was not entitled to summary judgment as a matter of law on the malicious prosecution claim because Weber failed to state undisputed facts regarding the "lack of probable cause" element of their claim and because Weber failed to establish there was no genuine dispute with regard to each element of Weber's advice-of-counsel defense.

■ Generally, a plaintiff may recover damages resulting from the initiation of a civil action where such action was prosecuted maliciously and without probable cause or was an abuse of process. *Dillard Dept. Stores, Inc., v. Muegler*, 775 S.W.2d 179, 183 (Mo.App. E.D.1989).

■ To prevail on a claim for malicious prosecution, a plaintiff must prove the following elements: (1) the previous commencement of a lawsuit against the plaintiff; (2) that was instigated by the defendant; (3) that terminated in favor of the plaintiff; (4) due to a lack of probable cause for the instigation of the suit; (5) because the defendant's conduct was motivated by malice; and (6) the plaintiff sustained damages as a result. *Ehrhardt*, 294 S.W.3d at 60; *Crow v. Crawford & Co.*, 259 S.W.3d 104, 114 (Mo.App. E.D.2008). The plaintiff must prove all six elements to make a submissible case of malicious prosecution. *Crow*, 259 S.W.3d at 114. On the contrary, the defendant in a suit for malicious prosecution may establish a right to summary judgment by showing facts negating any one of the plaintiff's elements or by establishing there is no genuine dispute as to the existence of each of the facts necessary to support an affirmative defense that the prior suit was filed on advice of counsel. *Id.*; *Ehrhardt*, 294 S.W.3d at 60.

■ The defense of advice of counsel requires a showing that the defendant made a full and truthful disclosure of all material facts to his attorney prior to the filing of the previous lawsuit. *Ehrhardt*, 294 S.W.3d at 60. Such disclosure requires the client to have informed his attorney of all material facts within is actual knowledge and those he might have learned by reasonable diligence. *Zahorsky v. Griffin, Dysart, Taylor, Penner and Lay, P.C.*, 690 S.W.2d 144, 152 (Mo.App. W.D.1985). Advice of counsel is an affirmative defense, and the defendant bears the burden of proof, even though such defense is "inextricably bound up with the plaintiff's burden to demonstrate lack of probable cause." *Ehrhardt*, 294 S.W.3d at 60, *quoting Zahorsky*, 690 S.W.2d at 152.

■ "Probable cause to instigate a civil suit" means a reasonable belief in the facts alleged plus a reasonable belief that the claim may be valid under the applicable law. *State ex rel. Police Retirement System of St. Louis v. Mummert*, 875 S.W.2d 553, 555 (Mo. banc 1994). "Probable cause does not depend upon what may have ultimately proved to be the actual state of facts embraced in the previous action or proceeding, but instead upon the honest and reasonable belief of one who instigated its prosecution." *Zahorsky*, 690 S.W.2d at 151–52 (quotations omitted). If

it appears that a reasonably prudent person would have believed and acted under the circumstances as did the person who instigated the previous action, then the existence of probable cause is sufficiently established. *Id.* at 152. However, if the previous claim against the plaintiff resulted in a decision on the merits in favor of the plaintiff, the acquittal itself constitutes some evidence of a lack of probable cause and is to be considered with the other facts and circumstances. *Ehrhardt,* 294 S.W.3d at 61. Because establishing the absence of probable cause requires proof of a negative, slight evidence is sufficient. *Id.* "If any material part of the evidence showing existence or want of probable cause is in conflict, a fact issue exists that is sufficient to make a submissible case." *Id., quoting Hoene v. Associated Dry Goods Corp.,* 487 S.W.2d 479, 483–84 (Mo. banc 1972).

■ Here, the voluminous record reveals numerous contradictions in the evidence that precluded the entry of summary judgment in favor of Weber on the malicious prosecution claim.

■ Dunne, Sr.'s, own testimony suggested that Weber lacked legitimate probable cause to instigate the defamation lawsuit[1] because even Dunne, Sr., could not say whether Weber had been harmed by the flyer[2]. Dunne, Sr., testified that he contacted Weber's attorneys only a day or two after the public hearing because he wanted to stop the flyer from being circulated and to find out who had created it. Dunne, Sr., gave Weber's attorneys their "marching orders" and told them to obtain

"whatever legal remedies possible, to stop the dissemination of [the flyer] . . . and the use of the word terrorist and to find out who put this together, period." However, Dunne, Sr., did not know whether anyone actually would have believed Weber was a "terrorist" based on the flyer. In fact, Dunne, Sr., had heard some "[p]eople in business meetings" joking about the flyer calling Weber "terrorists." Dunne, Sr., acknowledged that, before filing the defamation lawsuit, no one ever expressed a belief that the flyer diminished Weber's image. Dunne, Sr., further admitted that he was not offended by the other language contained in the flyer, which asked the public to consider hiring trash haulers that did not use Weber's landfill. Dunne, Sr., further testified that he had "made the decision" to sue Mr. Diehl. This testimony indicated that the defamation lawsuit was instigated on Dunne, Sr.'s, insistence that the flyer be stopped rather than on the reasonable belief that a valid defamation claim existed. Moreover, the evidence failed to establish that Dunne, Sr., made a full and truthful disclosure to Weber's attorneys regarding the lack of actual harm to Weber's reputation before the defamation lawsuit was filed. As the Diehls point out in the argument section of their brief, the evidence implied that Weber rushed to file the defamation lawsuit in order to stop the flyer's unflattering characterization of the company and to stop further public protest regarding the proposed trash transfer station.

Even the two trial court orders granting summary judgment in favor of Weber sug-

1. In Missouri, the elements of a defamation claim are: (1) publication; (2) of a defamatory statement; (3) that identifies the plaintiff; (4) that is false; (5) that is published with the requisite degree of fault; and (6) damages the plaintiff's reputation. *See State ex rel. BP Products North America, Inc., v. Ross,* 163 S.W.3d 922, 929 (Mo. banc 2005); *Overcast v.*

*Billings Mutual Ins. Co.,* 11 S.W.3d 62, 70 (Mo. banc 2000).

2. "Proof of actual reputational harm is an absolute prerequisite in a defamation action." *Johnson v. Allstate Indem. Co.,* 278 S.W.3d 228, 235 (Mo.App. E.D.2009) (quotations omitted).

gest contradictions. In the summary judgment on Wife's claim for prima facie tort, Judge Dierker specifically questioned the propriety of the earlier summary judgment on Mr. Diehl's claim for malicious prosecution and abuse of process. Additionally, this Court's decision in *Diehl I* finding Weber's defamation claims to be "meritless" reflects evidence of a lack of probable cause to instigate a civil suit. *See Ehrhardt*, 294 S.W.3d at 61. Accordingly, because of the contradictory evidence in the record and given our standard of review, we cannot conclude that Weber was entitled to summary judgment as a matter of law on Mr. Diehl's claim of malicious prosecution.

Second, the Diehls argue that Weber was not entitled to summary judgment as a matter of law on the abuse of process claim because they presented sufficient evidence from which a jury could have properly concluded that Weber abused the legal process in that it had an "improper purpose" for filing the lawsuit.

 To prevail on an abuse of process claim, a plaintiff must prove the following elements: (1) the defendant made an illegal, improper, perverted use of process, which was neither warranted nor authorized by the process; (2) the defendant had an improper purpose in exercising such illegal, perverted, or improper use of process; and (3) the plaintiff sustained damages as a result. *Duvall v. Lawrence*, 86 S.W.3d 74, 84–85 (Mo.App. E.D.2002). If the action filed by the defendant was confined to its regular and legitimate function, there is no abuse of process, even if the defendant had an ulterior motive in

bringing the action or knowingly brought the suit upon an unlawful claim. *Id.*, 86 S.W.3d at 85. The test is whether the process was used to accomplish some unlawful end or to compel the plaintiff to do some collateral thing that he could not be compelled to do legally. *Id.* The difference between a claim for malicious prosecution and abuse of process is not the commencement of an action without justification but the misuse of process for an end other than that which it was designed to accomplish. *Dillard Dept. Stores, Inc.*, 775 S.W.2d at 183; *Guirl v. Guirl*, 708 S.W.2d 239, 245 (Mo.App. E.D.1986).

 Here, given this Court's decision in *Diehl I* finding Weber's defamation lawsuit "meritless"[3] and our analysis of the Diehls' malicious prosecution claim in the instant case, we conclude that Weber was not entitled to summary judgment as a matter of law on the Diehls' abuse of process claim.

The trial court entered summary judgment against the Diehls on their abuse of process claim because it found that the original purpose of Weber's lawsuit was "to stop the publication of a flyer referring to [Weber] as a 'terrorist,' a term [Weber] believed was harmful . . . ." The trial court further found that this original purpose was not transformed into an improper purpose when this Court, in *Diehl I*, determined that the flyer was not defamatory but was "imaginative expression or rhetorical hyperbole" distributed at a public hearing intended to encourage public discourse and the sharing of opinions regarding a controversial issue. *See Diehl I*, 162 S.W.3d at 157. However, we find that

---

**3.** Although we found Weber's defamation lawsuit "meritless" in Diehl I, we note that the issues adjudicated in *Diehl I* occurred before the Missouri Legislature's enactment of Section 537.528, commonly referred to as the SLAPP law. SLAPP is an acronym for strate-

gic lawsuits against public participation, which are lawsuits brought for the purpose of retaliation for activity in opposition to a plaintiff's business interests. *See Diehl I*, 162 S.W.3d at 159, n. 6.

Weber presented no evidence establishing that, at the time the defamation lawsuit was filed, anyone reasonably believed Weber was a terrorist based on the contents of the flyer or that Weber's reputation was damaged as a result. Instead, the record before us implies that the defamation lawsuit might have been an attempt to compel Mr. Diehl to stop exercising his First Amendment right to publicly oppose the proposed trash transfer station, a collateral purpose. Consequently, there are disputed issues of material fact regarding whether Weber filed its defamation lawsuit to protect its reputation from harm or rather to quash distribution of the flyer and opposition to the trash transfer station, by seeking actual damages in excess of $100,000 and punitive damages of $5 million.

We likewise reverse the summary judgment on Wife's prima facie tort claim. In his order granting summary judgment in favor of Weber on Wife's prima facie tort claim, Judge Dierker acknowledged Judge Dowd's earlier summary judgment but found that, "after close scrutiny of the entire record, there may well be genuine issues of material fact" regarding the elements of Wife's prima facie tort claim. Judge Dierker further found that, "If the Court were to rule on the motion for summary judgment solely on those grounds, the motion might very well be denied." Judge Dierker, noted, however, that Wife's claim was "purely based upon the filing of the underlying Lawsuit against [Mr. Diehl] by Weber" and that Wife' claim was, therefore, dependent on the viability of Mr. Diehl's malicious prosecution and abuse of process claims. Consequently, given our decision reversing the summary judgment regarding Mr. Diehl's claims of malicious prosecution and abuse of process, we reverse the summary judgment on Wife's prima facie tort claim, which

arose from and was dependent upon Mr. Diehl's claims.

The Diehls' first and second points are granted.

### Intentional Infliction of Emotional Distress

In their third point on appeal, the Diehls contend the trial court misapplied the law when it dismissed their claim for intentional infliction of emotional distress.

 Our review of the trial court's grant of a motion to dismiss for failure to state a claim is *de novo*. *Hamid v. Kansas City Club*, 293 S.W.3d 123, 125 (Mo. App. W.D.). The propriety of the trial court's ruling on such a motion rests solely on the adequacy of the plaintiff's petition. *Hamid*, 293, S.W.3d at 125. The facts contained in the plaintiff's petition are treated as true and are construed liberally in favor of the plaintiff to determine if they meet the elements of a recognized cause of action or of a cause that might be adopted in the case. *Id.* If the plaintiff's petition sets forth any set of facts that, if proven, would entitle him to relief, then the petition states a claim. *Id.*

 In Missouri, to state a claim of intentional infliction of emotional distress, a plaintiff must plead: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; and (3) the conduct caused severe emotional distress resulting in bodily harm. *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. banc 1997); *K.G. v. R.T.R.*, 918 S.W.2d 795, 799 (Mo. banc 1996). The conduct must have been so outrageous in character and so extreme in degree that it is beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community. *Thomas v. Special Olympics Missouri, Inc.*, 31 S.W.3d 442, 446 (Mo.App.

W.D.2000); *Gibson,* 952 S.W.2d at 249. Furthermore, the conduct must have been intended only to cause extreme emotional distress to the victim. *Id.* However, Missouri courts have held that where one's conduct amounts to the commission of a traditional tort and was not intended only to cause extreme emotional distress to the victim, the tort of intentional infliction of emotional distress will not lie and recovery must be had under the appropriate traditional tort action. *K.G.,* 918 S.W.2d at 799. When a defendant's conduct is intended to invade other legally-protected interests of the plaintiff or intended to cause bodily harm and damages for mental suffering are recoverable for those other intentional tort claims, the recovery for emotional distress, as an independent tort, is duplicative. *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 (Mo. banc 1993); *Hester v. Barnett,* 723 S.W.2d 544, 561 (Mo. App. W.D.1987).

▇▇ Here, the Diehls argue that Weber's primary purpose in filing the defamation lawsuit was to cause them "immediate emotional distress" while the "collateral effect" of filing the lawsuit was political intimidation. We disagree. According to the facts alleged in the Diehls' petition, Weber's primary purpose in filing the defamation lawsuit was to silence the Diehls and other opponents of the proposed trash transfer station and to stop their public challenge to Weber's permit application for the trash transfer station. Notably, the petition did not allege that Weber's filing of the lawsuit was intended *only* to cause extreme emotional distress to the Diehls. *See Thomas,* 31 S.W.3d at 446. Although emotional distress might have been an element of damages in the Diehls' claims for malicious prosecution, abuse of process, and prima facie tort, which were still pending at the time the claim for intentional infliction of emotional distress was dismissed, the claim for intentional infliction of emotional distress could not have been maintained as a separate cause of action alongside the other tort claims because such a claim would have been duplicative. *See Nazeri,* 860 S.W.2d at 316; *Hester,* 723 S.W.2d at 561. Accordingly, the trial court did not err in dismissing this claim. Point denied.

### Attorney Work Product and Privileged Documents

Because the Diehls' fourth and fifth points on appeal assert claims concerning the trial court's rulings with regard to discovery requests, which are governed by the same standard of review and rules of law, we address those claims together.

▇▇ The trial court has broad discretion in controlling and managing discovery. *State ex rel. Dixon v. Darnold,* 939 S.W.2d 66, 68 (Mo.App. S.D.1997). We will not disturb the trial court's ruling regarding discovery unless the ruling was clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock the sense of justice and to indicate a lack of careful consideration. *State ex rel. Dixon,* 939 S.W.2d at 68.

Generally, parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action, whether it relates to the claim or the defense of the party seeking discovery or to the claim or the defense of any other party, as long as the intended discovery appears to be reasonably calculated to lead to the discovery of admissible evidence. Rule 56.01(b)(1).

Subject to the rule governing expert witnesses, parties may obtain discovery of documents and tangible things otherwise discoverable under Rule 56.01(b)(1) and prepared in anticipation of litigation by that party's representative only upon a

showing that the party seeking discovery has substantial need of the material in the preparation of its case and is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Rule 56.01(b)(3).

 Confidential communications between an attorney and his client concerning the representation of the client are protected by the attorney-client privilege. *In re Marriage of Hershewe*, 931 S.W.2d 198, 202 (Mo.App. S.D.1996). Absent a waiver, such privileged communications are immune from discovery. *State ex rel. Chase Resorts, Inc. v. Campbell*, 913 S.W.2d 832, 838 (Mo.App. E.D.1995). Attorney work product, both tangible and intangible, also is privileged. *Edwards v. Missouri State Bd. of Chiropractic Examiners*, 85 S.W.3d 10, 26 (Mo.App. W.D. 2002). The trial court shall apply the work product doctrine to protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories, both tangible and intangible, created or commissioned by counsel in preparation for possible litigation. Rule 56.01(b)(3): *State ex rel. Ford Motor Co. v. Westbrooke*, 151 S.W.3d 364, 367 (Mo. banc 2004); *State ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. O'Malley*, 898 S.W.2d 550, 553, 555 n. 2 (Mo. banc 1995). The work product doctrine applies to two types of information: opinion work product and trial preparation materials. *Edwards*, 85 S.W.3d at 26.

 The party seeking discovery has the burden of establishing the relevance of the sought-after materials. Rule 56.01(b)(1): *State ex rel. Ford Motor Co.*, 151 S.W.3d at 367. If relevance has been established or is uncontested and the opposing party asserts that a privilege precludes disclosure, the opposing party bears the burden of showing the privilege applies. *State ex rel. Ford Motor Co.*, 151 S.W.3d at 367. To invoke the protection of the work product doctrine, the party opposing discovery must establish, through competent evidence, that the materials sought to be protected are documents or tangible things prepared in anticipation of litigation or for trial and were prepared by or for a party or a representative of that party. *Id.*

In their fourth point, the Diehls claim the trial court abused its discretion in denying their emergency motion to compel the production of certain documents characterized by Weber as attorney internal work product.

During discovery, the Diehls served subpoenas *duces tecum* on the attorneys that had represented Weber in the underlying defamation lawsuit, seeking documents and testimony from them relating to Weber's factual and legal basis for filing and pursuing the underlying defamation lawsuit. Weber opposed the discovery request on the ground that such documents and testimony were protected by the attorney-client privilege and the work product doctrine.

The Diehls subsequently filed an emergency motion to compel production, alleging that Weber had waived both the attorney-client privilege and work product immunity with respect to all matters related to Weber's advice of counsel defense. In the motion, the Diehls argued that the requested materials were not protected by any privilege because Weber had delegated to the attorneys its authority to decide whether or not to sue the Diehls, and the delegation of such authority had caused the attorneys "to cease to be mere advisers, and made them corporate decision makers, whose knowledge and information [was] *per se* the knowledge and information of the corporation." The Diehls further argued that, in light of Weber's advice of counsel defense, they had substantial need for the information

and no substitute means for obtaining it and that they were entitled, as a matter of fundamental fairness, to discover the nature and circumstances of the legal advice upon which Weber relied in filing the defamation lawsuit.

Weber filed a memorandum in opposition to the Diehls' emergency motion to compel production. Weber argued that the information the Diehls sought had been prepared by Weber's attorneys in the underlying defamation lawsuit and was privileged because: (1) the information was work product containing the mental impressions, opinions, and litigation strategy of Weber's attorneys and has never been communicated to Weber, thus, the information was not relevant to Weber's decision to sue the Diehls or its advice of counsel defense; and (2) the attorneys at all times were engaged in providing professional advice to Weber and never became employees or corporate decision makers of Weber.

The trial court later called, heard, and denied the Diehls' emergency motion to compel production.

■■■ After reviewing of the numerous pleadings and supporting documents related to this claim, we find the trial court did not abuse its discretion in denying the emergency motion to compel production. The information the Diehls attempted to discover, such as the mental impressions, opinions, and litigation strategy of Weber's attorneys, all fell under the protection of the work product doctrine. Although the communications between the attorneys and Weber relating to the underlying defamation lawsuit were relevant to the advice of counsel defense and were required to be produced, nothing in the record suggests that the particular information the Diehls sought to discover through their motion to compel production was ever communicated by the attorneys

to Weber or had any bearing on Weber's decision to sue the Diehls. In fact, the Diehls' motion to compel does not even specify with any particularity the information they wished to obtain. Furthermore, the work product doctrine could not be avoided on the ground that Weber's attorneys became corporate decision makers as a result of Dunne, Sr.'s, directive that they pursue all legal remedies on behalf of Weber. Pursuing legal remedies for perceived wrongs against the company was the very nature of their function as attorneys, and these materials the attorneys prepared in view of litigation on Weber's behalf were privileged. The Diehls' fourth point is denied.

■ In their fifth point, the Diehls claim the trial court abused its discretion when it ordered them to return an inadvertently-produced document, known as the LRF email, to Weber. The Diehls essentially argue that the LRF email was discoverable because the email contained "advice of counsel regarding the legal validity" of the defamation lawsuit and Weber had waived any privilege in the email by asserting the advice-of-counsel defense to the Diehls' malicious prosecution and abuse of process claims.

The LRF email consisted of attorney-client communication between Weber and its attorney in the instant action and included the mental impressions, conclusions, and opinions of its current attorney with regard to the likelihood and potential merit of a malicious prosecution claim based on the dismissal of the underlying defamation lawsuit. Due to a clerical error, the two-page LRF email was mistakenly delivered to the Diehls along with thousands of pages of other documents as the result of production requests. Weber's attorneys became aware of the inadvertent disclosure after the Diehls attached a copy of the LRF email to one of

the Diehls' discovery motions. Weber filed a motion to compel the return of the LRF email alleging that it never intended to produce the LRF email. Attached to Weber's motion was the affidavit of Weber's attorney in the instant case, attesting to the accidental disclosure of the LRF email.

In its order granting Weber's motion to compel the return of the LRF email, the trial court found that Weber had not waived the attorney-client and work product privileges by inadvertently producing the LRF email because: (1) the Diehls and Weber had previously agreed, in an "Agreed Protective Order" entered by the trial court, that such inadvertent disclosures would not result in the full or partial waiver of any privilege; (2) the LRF email contained attorney-client communication and opinion work product and was, therefore, generally immune from discovery; and (3) under the "middle of the road" test,[4] reasonable precautions had been taken to prevent the inadvertent disclosure of privileged material, the disclosure was minimal in relation to the total production, Weber promptly acted to rectify the disclosure, and the interests of justice would be properly served by requiring the return of the LRF email and prohibiting the Diehls from making any use of it in the litigation. After reviewing the extensive record concerning this claim, we agree. Consequently, we find that the trial court did not abuse its discretion in ordering the Diehls to return the LRF email to Weber and in prohibiting its use in the remainder of the litigation. The Diehls' fifth point is denied.

### The Diehls' Amended Petition

As we understand their sixth point on appeal, the Diehls claim the trial court

abused its discretion in granting Weber's motion to strike their amended petition or, in the alternative, to deny them leave to file their amended petition to add claims against Weber's third party defendants. The Diehls argue that Rule 52.11(a) gave them the right to so amend. We disagree.

A party may amend a pleading once as a matter of right at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the pleading may be amended at any time within thirty days after it is served. Rule 55.33(a). Otherwise, a pleading may be amended only by leave of court or by written consent of the adverse party, and leave shall be freely given when justice so requires. *Id.*

 We review the trial court's denial of an amendment for abuse of discretion, and the burden is upon the proponent of the amendment to show the ruling was so arbitrary and unreasonable as to shock the sense of justice and to indicate a lack of careful consideration. *Dueker v. Gill,* 175 S.W.3d 662, 671 (Mo.App. S.D.2005). We will not disturb the trial court's exercise of discretion absent an obvious and palpable abuse of that discretion. *Hoover v. Brundage–Bone Concrete Pumping, Inc.,* 193 S.W.3d 867, 871 (Mo.App. S.D. 2006). In deciding whether to allow an amendment to a pleading, the trial court considers: (1) the hardship to the moving party if leave to amend is denied; (2) the reasons for the moving party's failure to include the matter in the original pleading; (3) timeliness of the proposed amendment; (4) whether the proposed amendment

---

**4.** *Gray v. Bicknell,* 86 F.3d 1472 (8th Cir. 1996); *United States v. Mallinckrodt,* 227 F.R.D. 295 (E.D.Mo.2005).

would cure the inadequacy of the moving party's pleading; and (5) the injustice to the non-moving party should leave to amend be granted. *Dueker*, 175 S.W.3d at 671; *Asmus v. Capital Region Family Practice*, 115 S.W.3d 427, 433 (Mo.App. W.D.2003).

According to the record, approximately three years after the litigation in this case began, Weber filed a third-party petition against the attorneys who had represented the company in the defamation lawsuit. The third-party petition alleged that the attorneys had committed legal malpractice by advising Weber to pursue the defamation lawsuit against the Diehls and that the attorneys should be required to indemnify Weber for all damages, liabilities, claims, costs, attorney's fees, and other expenses Weber might incur in defending against the Diehls' current claims. The Diehls thereafter filed a motion to sever the third-party claims, arguing that Weber had asserted such claims as a tactic to delay trial. The Diehls also argued that any claims Weber had against the attorneys were premature and would not ripen until Weber actually sustained damages as a result of a judgment in favor of the Diehls. Weber opposed the Diehls' motion to sever, arguing that the Diehls had not shown they would be prejudiced if the attorneys were allowed to be joined as third-party defendants and that separate trials would not be conducive to judicial economy. The trial court thereafter called, heard, and granted the Diehls' motion to sever.[5]

The Diehls' then filed their amended petition, pursuant to Rule 52.11(a), adding direct claims of civil conspiracy against Weber and the attorneys and naming Weber and the attorneys joint and several defendants on all counts of the amended petition.[6] Weber filed a motion to strike the amended petition or, in the alternative, to deny the Diehls leave to file the amended petition on the ground that the Diehls' claims against the attorneys were independent from the instant action and that the Diehls' could not rely on Rule 52.11(a) to assert those claims.

The trial court granted Weber's motion, finding that the Diehls' amended petition merely reasserted the same claims contained in their original petition, some of which had already been disposed through summary judgment and dismissal, with the only addition being a new cause of action for civil conspiracy against both Weber and the attorneys. The trial court further found that the Diehls could not assert direct claims against the attorneys because the attorneys had already been severed from the action as a result of the Diehls' previous motion to sever. Observing that the Diehls had argued against allowing Weber to join the attorneys as third-party defendants on the ground that Weber's claims against the attorneys "were premature and would not ripen" until Weber sustained damages as a result of a judgment in favor of the Diehls, the trial court reasoned:

> [A]s [the Diehls] would have it, there truly can be no third-party claim at all because such a claim would became [sic] moot upon the Court's issuance of sum-

5. The attorneys subsequently filed motions to dismiss Weber's third party claims against them, but the trial court apparently never ruled on those motions. Later, Weber voluntarily dismissed without prejudice its third party claims against the attorneys.

6. The Diehls filed their amended petition following the entry of summary judgment in favor of Weber on Mr. Diehl's claims of malicious prosecution and abuse of process but prior to the entry of summary judgment in favor of Weber on Wife's claim of prima facie tort.

mary judgment in [Weber's] favor on the malicious prosecution claim. According to reasoning expressed in [the Diehls'] own motion to sever relating to the separateness of the [Diehls'] claims from [Weber's] third-party claims, [Weber's] claims against the third-party defendants are moot, rendering the claims [the Diehls] now attempt to assert in their Amended Petition against the severed third-party defendants moot. In sum, because the pretext for an invocation of any right owing under Rule 52.11(a) is commonality of a "transaction or occurrence," this Rule cannot be read to afford [the Diehls] an opportunity, at this stage of the litigation, to amend their petition as a matter of right.

The trial court also reasoned that the Diehls were not entitled to amend their petition as a matter of right under Rule 55.33(a) because: (1) the Diehls had filed their original petition more than three years earlier, and Weber had already filed several responsive pleadings; and (2) the matter had been placed on the trial docket before the Diehls attempted to amend their petition.

The trial court also denied the Diehls leave to amend on the ground that the Diehls did not articulate a clear reason for amending their petition so late in the litigation and that the amendments were futile in light of the court's previous rulings. The trial court also found that Weber would suffer injustice if leave to file the amended petition was granted because of the resources expended in the three years it had litigated the matter but that the Diehls would not suffer hardship because they had "been fairly afforded the opportunity to litigate their claims" and sought to amend their pleadings only "upon the issuance of adverse rulings."

■ On review, given the record before us, we find that the trial court did not abuse its discretion in finding that the Diehls were not entitled to amend their petition as a matter of right. First, the trial court correctly found that the Diehls could not amend their petition as a matter of right under Rule 55.33(a) because responsive pleadings had already been filed and the matter had already been placed on the trial docket. Second, the trial court correctly found that the Diehls could not amend their petition as a matter of right under Rule 52.11(a). Rule 52.11(a) applies when a plaintiff wishes to add claims against a third-party defendant arising out of the same transaction or occurrence that is the subject matter of the plaintiff's claim against the defendant. In this case, the attorneys were no longer parties to the action. They had been severed based on the Diehls' own motion to sever. Third, the trial court correctly found that the Diehls would not suffer hardship if the claims against the attorneys were not added because they had ample opportunity to assert those claims earlier in the litigation. The Diehls failed to explain their reasons for failing to include the attorneys in the original pleading, yet they had vigorously opposed Weber's attempt to bring the attorneys into the action. Consequently, allowing the Diehls to amend their petition to include the attorneys would have been an injustice to Weber, which had already spent considerable time and resources during the course of the litigation. Furthermore, the Diehls failed to show the existence of any new or additional facts pertaining to their possible claims against the attorneys that were overlooked or unknown when they originally filed their petition. *See Mackey v. Mackey,* 914 S.W.2d 48, 50 (Mo.App. W.D.1996). The trial court did not abuse its discretion in granting Weber's motion. Point denied.

### Conclusion

Because there remain disputed issues of material fact, the trial court erred in granting summary judgment in favor of Weber on the Diehls' claims of malicious prosecution and abuse of process and Wife's claim for prima facie tort. We therefore reverse the trial court's judgment and remand the case for further proceedings with regard to those claims. We affirm the trial court's rulings concerning the Diehls' claims regarding intentional infliction of emotional distress, the return of privileged documents, the discovery of attorney work product, and the striking of the Diehls' amended petition.